UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Daniel Van Kruiningen and Kimberly Chatterton,<br>    Plaintiffs, | :<br>:<br>:<br>: |
| v. | :    Case No. 3:05cv1528 (JBA) |
| Plan B, LLC d/b/a Mohegan After Dark,<br>    Defendant. | :<br>:<br>:<br>: |

**RULING ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**
**[DOC. # 74]**

Plaintiffs Daniel Van Kruiningen and Kimberly Chatterton initiated this action against their former employer Plan B, L.L.C. d/b/a Mohegan After Dark ("After Dark") following their termination from After Dark on January 13, 2004, alleging termination in retaliation for their reporting of activity they believed constituted sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count 1), 42 U.S.C. § 2000e et seq., and the Connecticut Fair Employment Practices Act ("CFEPA") (Count 2), Conn. Gen. Stat. § 46a-60 et seq., and also claiming termination in violation of Connecticut public policy in retaliation for their reporting of conduct that they believed violated a Connecticut statutory provision prohibiting serving alcohol to minors (Count 3).[1]

---

[1] Plaintiffs initially also claimed in Count 3 termination in violation of the public policy requiring "that places of public accommodation provide clean and sanitary surfaces for the service of food and beverages," Compl. [Doc. # 1] ¶ 46, although

1

The facts underlying this dispute, as outlined in the Complaint [Doc. # 1], include that early on the morning of December 7, 2003, plaintiff Chatterton walked through three clubs owned by defendant on the premises of the Mohegan Sun Casino, collectively operated under the name Mohegan After Dark; Chatterton was Club Manager of one of these three clubs. Compl. ¶¶ 15-21, 22. In one of the clubs, Chatterton encountered George Wright, General Manager of Mohegan After Dark, with two bartenders and a 20-year old female employee who was obviously intoxicated; Chatterton later spoke with the two bartenders who informed her that Wright had instructed them to serve drinks to the young employee for the purpose of causing her to become intoxicated. Id. ¶¶ 22-24. Chatterton informed Van Kruiningen of the events she had observed, together they obtained a copy of the video recording of the events from the security camera, and they each reported the events to the owners of After Dark (Chatterton to David Brilliant, co-owner, and Van Kruiningen to Patrick Lyons, manager and "principal owner"). Id. ¶¶ 25-32.

Defendant now moves pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings dismissing Count 3, contending that Connecticut public policy is inapplicable to events which occurred within the Reservation of the Mohegan Tribe of Indians

---

in briefing on this Motion plaintiffs represent that they "will not pursue that policy," Pl. Opp. [Doc. # 79] at 6 n.2.

of Connecticut (the "Reservation") and also contending that Count 3 is not legally viable under Connecticut law. See Mot. Judg. on Pleadings [Doc. # 74]. For the reasons that follow, defendant's Motion will be denied.

**I. Standard**

Fed. R. Civ. P. 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." The "standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001). "In both postures, the district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor. . . . The court will not dismiss the case unless it is satisfied that the complaint cannot state any set of facts that would entitle him to relief." Id.

To survive defendant's Motion, plaintiffs must set forth "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff[s'] claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is

3

entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

**II. Discussion**

    A. Other Statutory Remedies

As a general matter, employment relationships in Connecticut are "at-will" absent a contract to the contrary. See Thibodeau v. Design Group One Architects, LLC, 802 A.2d 731, 735 (Conn. 2002). However, in 1980, the Connecticut Supreme Court "sanctioned a common-law cause of action for wrongful discharge in situations in which the reason for the discharge involved impropriety derived from some important violation of public policy. . . . In doing so, [Connecticut] recognized a public policy limitation on the traditional employment at-will doctrine in an effort to balance the competing interests of employers and employees." Id. at 735-36 (citing Sheets v. Teddy's Frosted Foods, Inc., 427 A.2d 385 (Conn. 1980)). "'The cases which have established a tort or contract remedy for employees discharged for reasons violative of public policy have relied upon the fact that in the context of their case the employee was <u>otherwise without a remedy</u> and that permitting the discharge to go unaddressed would leave a valuable social policy to go unvindicated.'" Burnham v. Karl & Gelb, P.C., 745 A.2d 178, 182

(Conn. 2000) (holding that plaintiff could not claim discharge in violation of public policy where statute on which claimed public policy was premised provided plaintiff a remedy) (emphasis in original) (citing Atkins v. Bridgeport Hydraulic Co., 501 A.2d 1223, 1226 (Conn. Ct. App. 1985)).[2] In articulating the public policy exception to the at-will employment doctrine, the Connecticut Supreme Court "'intended merely to provide a 'modicum of judicial protection' for those who did not already have a means of challenging their dismissals under state law.'" Medvey v. Oxford Health Plans, 313 F. Supp. 2d 94, 99 (D. Conn. 2004) (citing Banerjee v. Roberts, 641 F. Supp. 1093, 1108 (D. Conn. 1986), and Sheets, 427 A.2d at 388).

Defendant contends that Count 3 must be dismissed because there are other statutory remedies available to plaintiffs to challenge their termination, specifically, Title VII and the CFEPA, under both of which plaintiffs also sue. However, while defendant is correct that plaintiffs seek remedy for their

---

[2] See also Felekey v. Am. Telephone & Telegraph Co., No. 02 CV 691 (CFD), 2004 WL 2958468, at *3-4 (D. Conn. Nov. 3, 2004) (granting defendant's motion to dismiss plaintiff's wrongful discharge claim where the public policy articulated by plaintiff – "for timely payment of full wages and compensation or benefits earned for just services" – was embodied in a state statute, which also provided a remedy for violations of the policy); Swihart v. Pactiv Corp., 187 F. Supp. 2d 18, 25 (D. Conn. 2002) (precluding plaintiff's wrongful discharge claim where "[t]he public policy against retaliation is adequately vindicated through Title VII and the remedies available thereunder," noting, "a public policy cause of action is only available when a plaintiff is otherwise without a remedy").

5

termination in three separate counts, defendant's argument ignores the instruction by Connecticut courts that the rationale underlying the tort of termination in violation of public policy is that "permitting the discharge to go unaddressed would leave a valuable social policy to go unvindicated."  See Burnham, supra.  Thus, for example, this Court in Storm v. ITW Insert Molded Products, 400 F. Supp. 2d 443, 446 (D. Conn. 2005), dismissed a public policy termination claim, where "[t]he public policies against age discrimination articulated in the statutes referenced by plaintiff . . . are already safeguarded by the remedies enumerated in those statutes, and thus a claim for public policy wrongful discharge is not plaintiff's sole means for vindicating that anti-discrimination policy."  By contrast, however, the policy underlying plaintiffs' Count 3 here – not serving alcohol to minors – is distinct from that underlying their Title VII and CFEPA claims – protecting against sexual harassment in the workplace – and thus maintenance of plaintiffs' other claims might nevertheless allow the alleged important public policy of not serving alcohol to minors to go unvindicated.  Accordingly, plaintiffs' Count 3 advances a distinct and alternative theory of liability, related to a public policy that is not protected by Title VII and/or the CFEPA, and thus it will not be dismissed on this ground.

    B.    <u>Applicability of Connecticut Public Policy</u>

Next, defendant contends that the Connecticut public policy alleged in Count 3, i.e., that articulated in Conn. Gen. Stat. § 30-86 that a licensed seller of alcoholic beverages not deliver such beverages to a minor, is not applicable here because the events giving rise to plaintiffs' claim occurred on the Reservation.

As a general matter, "[s]tate sovereignty does not end at a reservation's border [and] it was long ago that the [Supreme] Court departed from Chief Justice Marshall's view that the laws of a State can have no force within reservation boundaries." Nevada v. Hicks, 533 U.S. 353, 361 (2001) (internal quotations omitted). Accordingly, "it is now clear, an Indian reservation is considered part of the territory of the State." Id. at 361-62. Thus, ordinarily "even on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148 (1973).

While defendant references the doctrine of tribal sovereign immunity, and cites case law holding that "in order for Connecticut to assume civil jurisdiction [over private actions involving matters that occurred on tribal land], the state must first obtain the consent of the affected tribe" and that thus the applicable tribal court "is the exclusive forum for the

7

adjudication and settlement of tort claims against the tribe and its employees because it is the forum in which the sovereign has consented to being sued,"[3] such principles do not extend to matters involving exclusively non-tribal members where the tribe will not be affected by the outcome of the litigation, see, e.g., Ellis v. Allied Snow Plowing, Removal & Sanding Servs. Corp., 838 A.2d 237 (Conn. App. Ct. 2004) (observing that "tribes generally lack civil authority over the tortious conduct of nonmembers of the tribe unless the underlying activity directly affects the tribe's political integrity, economic security, health or welfare").[4] As plaintiffs here observe, there is no suggestion that the outcome of this case, or this claim, will have any

---

[3] See Kizis v. Morse Diesel Int'l, Inc., 794 A.2d 498, 505 (Conn. 2002) (concerning Connecticut courts' subject matter jurisdiction over civil litigation brought by non-member of tribe against employees of tribe and the Mohegan Tribal Gaming Authority over an injury that occurred on the Mohegan Reservation).

[4] Ellis held that a negligence claim against a contractor hired by a tribe to provide snow removal service on its parking lot was not within the tribal court's exclusive jurisdiction, rejecting the contention that a "properly authorized tribal court with broad tribal authority unfailingly ousts the [Connecticut] Superior Court of jurisdiction to hear any case that is in any way related to tribal activities." See also Horn v. Lewis Equipment Co., LLC, No. X04CV030104509S, 2004 WL 2222399, at *2 (Conn. Super. Ct. 2004) (holding that Connecticut state court jurisdiction existed over dispute between two non-tribal corporations where no tribal member was involved in dispute, the applicable contract concerned activity at the Mohegan Sun Hotel but related neither to gaming nor to any specific tribal activity, and there was no tribal self-governance issue at stake).

8

effect on the governance of the Mohegan Nation nor any of its members.

Morever, and in any event, the scope of the Tribe's exclusive civil jurisdiction is distinct from the issue of whether Connecticut's public policy extends to events occurring within the Reservation's borders, and defendant does not cite authority suggesting otherwise. In fact, with respect to the specific public policy at issue here, the Supreme Court has found that "tradition simply has not recognized a sovereign immunity or inherent authority in favor of liquor regulation by Indians," rather, there is a "historical tradition of concurrent state and federal jurisdiction over the use and distribution of alcoholic beverages in Indian country [] justified by the relevant state interests involved." See Rice v. Rehner, 463 U.S. 713, 722, 724 (1983) (noting states' "unquestionable interest in the liquor traffic that occurs within its borders"). Accordingly, "the tribes have long ago been divested of any inherent self-government over liquor regulation." Id. at 726; see also 98 Op. Conn. Att'y Gen. 13, 1998 WL 1109417 (1998) (interpreting Rice as holding "that state laws were not preempted [by operation of federal law] and that in fact, 18 U.S.C. § 1161 explicitly delegated to the states and to the tribes Congress' authority to regulate liquor transactions on Indian reservations" and "[w]hile the Tribes have concurrent authority to regulate liquor sales

9

within their borders, they may not sell and distribute alcoholic beverages unless they comply with state law"). In the absence of contrary authority, Connecticut's public policy prohibiting serving alcohol to minors, as articulated in Conn. Gen. Stat. § 30-86, applies to defendant here, notwithstanding that its business is operated on the Mohegan Reservation.[5]

C. Other Considerations

Defendant also contends that the public policy alleged to have been violated here is not sufficiently "important" or "clearly articulated," that plaintiffs have not alleged an objective violation of that policy or a sufficient nexus between defendant's conduct and a clear mandate of public policy, and that plaintiffs have not alleged an intentional violation of that policy.

Addressing these arguments <u>seriatim</u>, the alleged public policy prohibiting serving alcohol to minors is reflected in Conn. Gen. Stat. § 30-86(b), which clearly prohibits "[a]ny permittee or any servant or agent of a permittee" from "sell[ing] or deliver[ing] alcoholic liquor to any minor." Section 30-86(b)(3), to which defendant refers, excepting the prohibition

---

[5] Additionally, as represented by defense counsel at the January 4, 2007 pretrial conference, the Reservation also has a drinking age of 21 and its own liquor policy adopts the statutory provisions of Connecticut's liquor law (<u>see</u> <u>also</u> Tribe Liquor Control Code, Art. V, § 3-281 [Doc. # 75-2]). Thus state and tribal policies are entirely compatible.

10

from "shipment or delivery made to a person over age eighteen who is an employee or permit holder under section 30-90a and where such sale, shipment or delivery is made in the course of such person's employment or business," is clearly inapplicable to the allegations in the Complaint, which establish that the minor was being served alcohol for consumption, not sale, shipment or delivery, and that such activity did not take place in the course of the minor's employment or business, occurring only after operating hours and with no customers present.

Next, defendant argues that Count 3 fails to allege facts which objectively demonstrate that defendant (as opposed to Wright) actually committed the claimed public policy violation or establish a nexus between its conduct and the claimed violation. However, the directives of the cases cited by defendant that an employee's subjective beliefs cannot form the basis for a public policy termination claim, see, e.g., Parsons v. United Techs. Corp., 700 A.2d 655, 666 (Conn. 1997); Fenner v. Hartford Courant Co., 822 A.2d 982, 989 (Conn. App. Ct. 2003), are inapposite here where the objective violation claimed by plaintiffs is defendant's termination of them for their efforts to ensure compliance with Conn. Gen. Stat. § 30-86(b) by reporting Wright's activity. See Maury v. Computer Sciences Corp., No. 02cv1492 (DJS), 2005 WL 646217, at *6 (D. Conn. Mar. 16, 2005) (observing "[t]he Connecticut Supreme Court has established that it is a

11

violation of public policy for an employer to terminate an employee in retaliation for efforts to ensure compliance with state and federal laws" and holding that plaintiff proffered "far too many incidents of possible copyright violations for his evidence to be dismissed as insufficient") (citing <u>Faulkner v. United Techs. Corp.</u>, 693 A.2d 293 (1997); <u>Sheets</u>, 427 A.2d at 388-89 (reversing order granting motion to strike where "plaintiff alleged that he had been dismissed in retaliation for his insistence that the defendant comply with the requirements of a state statute, the Food, Drug and Cosmetic Act," observing "when there is a relevant state statute we should not ignore the statement of public policy that it represents")); <u>Thibodeau v. Design Group One Architects, LLC</u>, 802 A.2d 731, 735 n.10 (Conn. 2002) (observing that the Connecticut Supreme Court in <u>Sheets</u> "concluded that Sheets . . . had stated a claim for wrongful discharge <u>on the basis of his contention that he was dismissed in retaliation for his efforts to ensure that his employer's products would comply with the applicable law relating to labeling</u>") (emphasis added).[6]

---

[6] The Court is unpersuaded by defendant's attempt to distinguish <u>Maury</u>, <u>Faulkner</u>, and <u>Sheets</u>. While <u>Faulkner</u> and <u>Sheets</u> did involve discharges resulting from employees' refusals to commit unlawful acts which could expose them to criminal sanctions, and in <u>Maury</u>, the plaintiff repeatedly objected to violations of copyright law, the holdings of these cases did not limit public policy termination claims to such circumstances or impose a bright-line rule concerning the amount of unlawful behavior or the number of times a plaintiff must have objected

12

For the same reason, defendant's argument about the lack of nexus between its conduct and the public policy at issue fails because the violation plaintiffs allege is defendant's termination of them in retaliation for their efforts to ensure compliance with the public policy of not serving alcohol to minors, as articulated in Conn. Gen. Stat. § 30-86(b).

Defendant's argument that plaintiffs' allegations, if proved, would not establish that defendant intended to frustrate public policy, because "[t]he plaintiffs' allegations fail to convey any implication, let alone an express accusation that the employer was aware of the activity at the time it occurred, let alone that it intended the activity to occur," Def. Mem. at 19, misses the mark: plaintiffs' claim is not that defendant is liable for the alleged service of alcohol to a minor by Wright, but rather that defendant is liable for <u>its</u> termination of plaintiffs in retaliation for their complaints <u>to defendant</u> that Wright had plied a minor with alcohol. See Compl. ¶ 49 ("By

---

to/reported that conduct. Defendant maintains that "[u]nder plaintiffs' theory, every employee who observes – but does not participate in – a supervisor's single violation of an important public policy, and who reports such violation to her employer, is immune from termination on an at-will basis." See Def. Reply [Doc. # 85] at 4-5. This is an overstatement because it overlooks the reality that such plaintiff must prove that he or she was terminated <u>in retaliation for</u> his or her reports of such unlawful conduct; while the amount of allegedly unlawful conduct, and/or the number of times plaintiffs voiced complaints, may be relevant to the jury's causation determination, these considerations do not render plaintiffs' public policy claim as alleged legally insufficient.

reporting that Wright had served alcoholic beverages to a minor at Mohegan After Dark, the Plaintiffs were opposing conduct that offends public policy), ¶ 51 ("By terminating the Plaintiffs because they opposed this conduct, the Defendant terminated the Plaintiffs in violation of public policy."). Of course, it will be plaintiffs' burden at trial to prove that the reason for their termination was retaliation for their conduct in reporting the claimed violation as they allege, but their allegations are not insufficient as a matter of law.[7]

---

[7] While the Court is mindful that, as defendant observes, the public policy wrongful discharge exception to the at-will employment doctrine in Connecticut is narrowly construed, the cases cited by defendant where courts refused to expand the exception are distinguishable from the facts of this case. In those cases the plaintiff did not allege conduct covered by the statute/public policy claimed and/or a statutory remedy was available to the plaintiff for the violation claimed. See Banerjee v. Roberts, 641 F. Supp. 1093, 1108 (D. Conn. 1986) (no public policy termination claim where plaintiff did not allege violation of "anti-blacklisting" provision of Conn. Gen. Stat. § 31-51 before his dismissal and where Conn. Gen. Stat. § 46a-58(a) and 46a-60(a)(1) provided their own remedy for violation thereof); Thibodeau, 802 A.2d 731 (architecture firm not "employer" within meaning of CFEPA, having less than three employees, and thus public policy against sex discrimination was inapplicable); Burnham, 745 A.2d 178 (plaintiff's reporting unsafe dental practices to a dental association did not constitute reporting to a "public body" and statute provided remedy for the allegedly retaliatory conduct); Daley v. Aetna Life & Casualty Co., 734 A.2d 112 (Conn. 1999) (no public policy claim for termination in retaliation for criticizing employer's failure to provide flexible work schedules for working parents because no requirement existed in either state or federal Family and Medical Leave Acts to provide such arrangements); Carbone v. Atlantic Richfield Co., 528 A.2d 1137 (Conn. 1987) (employee terminated for failing to obtain accurate information concerning competitors' pricing had no public policy termination claim where he challenged the "manner" in which he was terminated but

**III. Conclusion**

For the foregoing reasons, defendant's Motion for Judgment on the Pleadings [Doc. # 74] is DENIED. As the parties and the Court contemplated at the January 4, 2007 pre-trial conference, this disposition of defendant's Motion renders academic its objection to plaintiff's Motion for Jury Trial as to Back Pay [Doc. # 58] because the claim of lost pay is part of the damages claim for Count 3 which will be presented to the jury. Accordingly, plaintiffs' Motion [Doc. # 58] is GRANTED.

IT IS SO ORDERED.

/s/
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 1st day of May, 2007.**

---

articulated no impropriety deriving from any public policy); Morris v. Hartford Courant Co., 513 A.2d 66 (Conn. 1986) ("[a] false but negligently made accusation of criminal conduct as a basis for dismissal is not a 'demonstrably improper reason for dismissal,'" when employer was not statutorily obligated to investigate veracity of accusation); Jarrett v. Community Renewal Team, Inc., No. CV020816341S, 2003 WL 1962835 (Conn. Super. Ct. Apr. 3, 2003) (no public policy termination claim where plaintiff failed to allege a violation of any explicit statutory or constitutional provision or any "judicially conceived notion of public policy" that "employees in Connecticut who experience 'a serious health condition' should be given the opportunity to recover and return to gainful employment without the consequence of losing their jobs," absent any judicial precedent establishing or recognizing such a policy). Here, the statute prohibiting the sale of alcohol to minors does not impose any limitations in applicability (as does, for example, the statute at issue in Thibodeau), nor, as discussed above, is there a statutory remedy available to plaintiffs to redress the claimed retaliation in violation of the public policy articulated in the statute.

15